IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

MICHAEL K. GREGORY,

        Plaintiff,

        v.                                Civil Action No. 2:05-cv-6

MICHAEL ASTRUE,
Commissioner of Social Security,

        Defendant.


**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**


**I. Introduction**

A.    <u>Background</u>

        Plaintiff, Michael K. Gregory, (Claimant), filed his Complaint on January 31, 2004,

seeking judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1] Commissioner filed his Answer on

November 15, 2005.[2] Claimant filed his Motion for Summary Judgment on December 15, 2005.[3]

Commissioner filed her Motion for Summary Judgment on February 8, 2006.[4]

B.    <u>The Pleadings</u>

        1.    <u>Claimant's Motion for Summary Judgment</u>.

        2.    <u>Commissioner's Motion for Summary Judgment</u>.

---

[1] Docket No. 1.

[2] Docket No. 13.

[3] Docket No. 16.

[4] Docket No. 22.

C.    Recommendation

I recommend that:

1.    Claimant's Motion for Summary Judgment be GRANTED and the case REMANDED to the Commissioner because the ALJ failed to properly analyze Claimant's subjective complaints of pain and because substantial evidence does not support the ALJ's failure to include any limitations in reaching in his hypothetical question to the Vocational Expert.

2.    Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

## II.  Facts

A.    Procedural History

Claimant filed an application for Disability Insurance Benefits on September 6, 2002, alleging disability since March 21, 2001.  The claim was denied initially and on reconsideration. Claimant requested a hearing before an ALJ and received a hearing on November 13, 2003.  The ALJ issued a decision unfavorable to Claimant on January 2, 2004.  Claimant requested review by the Appeals Council, but it denied the request.  Claimant brought this action, which proceeded as set forth above.

B.    Personal History

Claimant was 46 years old on the date of the November 13, 2003 hearing before the ALJ. Claimant has vocational training in addition to a high school education. Claimant has prior relevant work experience as a truck driver, ambulance driver, coal company laborer, caretaker, and coal mining equipment operator.

C. <u>Medical History</u>

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability: March 21, 2001– January 2, 2004.[5]

**(Name illegible), 4/27/82, Tr. 169**
Impression: the patient has a back contusion and sprain

**J. A. Noronha, M.D., 10/17/84, Tr. 171**
Discharge diagnoses: cervical concussion, lumbosacral sprain, right ankle sprain

**Luis A. Loimil, M.D., 10/29/85, Tr. 175**
Impression: there was a back strain at the time of injury

**Jack Pushkin, M.D., 1/12/87, Tr. 178**
Clinical impression: chronic low back strain

**Joseph A. Snead, M.D., 3/2/95, Tr. 184**
Diagnosis: knee contusion bipartite patella

**Joseph A. Snead, M.D., 7/14/86, Tr. 185**
Impression: there is a low grade bulging or herniated lumbar disc at the L4-5 level.

**David A. Santrock, M.D., 7/20/95, Tr. 190**
Impression: sprain posterolateral complex right knee, R/O early reflex dystrophy

**James D. Weinstein, M.D., 2/14/02, Tr. 237**
Diagnosis: cervical sprain, cervical disc displacement, head injury

**James D. Weinstein, M.D., 1/4/02, Tr. 241**
Diagnosis: cervical disc spondylosis

**Webster County Memorial Hospital, 11/20/01, Tr. 242**
Diagnosis: cervical disc disease and radiculopathy

---

[5] Some of the evidence in the record comes from before and after the relevant time period. Evidence obtained prior to the alleged onset date may be relevant to the instant claim. See Tate v. Apfel, 167 F.3d 1191, 1194 n.2 (8th Cir. 1999); Burks-Marshall v. Shalala, 7 F.3d 1346, 1348 n. 6 (8th Cir. 1993); Williams v. Barnhart, 314 F. Supp. 2d 269, 272 (S.D.N.Y. 2004). Evidence from after the relevant time period should also be considered as long as it relates to the relevant time period. Wooldridge v. Bowen, 816 F.2d 157, 160 (4th Cir. 1987).

**Webster County Memorial Hospital, 9/25/01, Tr. 243**
Diagnosis: cervical spondylosis, neck pain

**Webster County Memorial Hospital, 8/6/01, Tr. 244**
Diagnosis: neck pain, cervical spondylosis

**Webster County Memorial Hospital, 4/24/01, Tr. 245**
Diagnosis: neck sprain, cervical spondylosis, (illegible), (illegible)

**Webster County Memorial Hospital, 4/10/01, Tr. 246**
Diagnosis: cervical neck sprain, closed, head injury

**Robert M. Mace, M.D., 8/22/84, Tr. 256**
Diagnosis and prognosis: acute lumbar muscle sprain

**Robert M. Mace, M.D., 8/22/84, Tr. 258**
Diagnosis and prognosis: acute lumbar muscle sprain

**Robert M. Mace, M.D., 8/7/84, Tr. 259**
Diagnosis and prognosis: lumbar muscle sprain

**Robert M. Mace, M.D., 8/7/84, Tr. 260**
Diagnosis and prognosis: acute lumbar muscle sprain

**J. G. Gomez, M.D., 6/24/82, Tr. 265**
Diagnosis: back contusion

**Robert M. Mace, M.D., 5/4/82, Tr. 267**
Diagnosis: lumbar muscle sprain

**Robert M. Mace, M.D., 4/20/82, Tr. 268**
Diagnosis: lumbar muscle sprain

**Robert M. Mace, M.D., 4/19/82, Tr. 269**
Diagnosis: lumbar muscle sprain

**Stephanie Frame, M.D., 3/24/01, Tr. 281**
Impression: cervical spondylosis causing some foraminal encroachment and mild cord compression, possible small disk herniation

**Webster County Memorial Hospital, 9/25/01, Tr. 284**
Diagnosis: neck pain, cervical spondylosis

**Webster County Memorial Hospital, 8/6/01, Tr. 286**

Diagnosis: neck pain, cervical spondylosis

**Webster County Memorial Hospital, 7/11/01, Tr. 287**
Diagnosis: neck pain, spondylosis

**Webster County Memorial Hospital, 6/26/01, Tr. 288**
Diagnosis: neck pain, spondylosis L5-6

**Webster County Memorial Hospital, 6/7/01, Tr. 289**
Diagnosis: cervical neck pain, spondylosis L5-6

**Webster County Memorial Hospital, 5/1/01, Tr. 291**
Diagnosis: cervical neck pain, spondylosis L5-6

**Webster County Memorial Hospital, 4/24/01, Tr. 292**
Diagnosis: cervical L5-6 spondylosis with (illegible) and mild cord compression

**Webster County Memorial Hospital, 4/17/01, Tr. 293**
Diagnosis: spondylosis L5-6, cervical neck pain

**Webster County Memorial Hospital, 4/11/01, Tr. 294**
Diagnosis: spondylosis L5-6, cervical neck pain

**Webster County Memorial Hospital, 3/27/01, Tr. 295**
Diagnosis: cervical neck pain

**Webster County Memorial Hospital, 3/23/01, Tr. 296**
Diagnosis: cervical neck pain

**Janis L. Hurst, M.D., 3/23/01, Tr. 297**
Impression: C5-6 degenerative disc disease

**Webster County Memorial Hospital, 3/22/01, Tr. 299**
Diagnosis: closed head injury

**Webster County Memorial Hospital, 12/18/96, Tr. 300**
Diagnosis: cervical strain, elevated rib # 1

**James D. Weinstein, M.D., 1/2/02, Tr. 305**
Pre-operative diagnosis: cervical disc spondylosis

Post-operative diagnosis: cervical disc spondylosis

**James D. Weinstein, M.D., 1/3/02, Tr. 306**

Principal diagnosis: cervical disc/spondylosis

**James D. Weinstein, M.D., 1/10/02, Tr. 307**
Ord. diagnosis: probe placement C5-C6

**Arturo Sabio, M.D., 11/17/02, Tr. 309**
Diagnostic impression: degenerative disc disease, cervical spine, status post diskectomy of the cervical spine, adhesive capsulitis of the shoulders and chronic lumbar sprain

**Dean R. Ball, D.O., 11/12/02, Tr. 314**
Impression: marked narrowing L5-S1 and less so L4-5 intervertebral discs, otherwise normal appearing lumbar spine study

**Physical Residual Functional Capacity Assessment, 12/3/02, Tr. 315**
Exertional limitations
       Occasionally lift and/or carry 20 pounds
       Frequently lift and/or carry 10 pounds
       Stand and/or walk for a total of about 6 hours in an 8 hour work day
       Sit for a total of about 6 hours in an 8 hour work day
       Push and/or pull: unlimited

Postural limitations
       Climbing, balancing, stooping, kneeling, crouching, crawling: occasionally

Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established
Environmental limitations: none established

**James D. Weinstein, M.D., 11/19/01, Tr. 340**
Diagnostic description: cervical sprain, cervical disc displacement, head injury

**James D. Weinstein, M.D., 1/14/03, Tr. 355**
Impression: somewhat limited study due to patient motion, evidence of foraminal encroachment related predominantly to osteophyte formation, these changes would be better assessed by CT scan, further foraminal encroachment related to small disc herniation

**James D. Weinstein, M.D., 1/14/03, Tr. 356**
Impression: somewhat limited study due to patient motion, evidence of foraminal encroachment related predominantly to osteophyte formation, these changes would be better assessed by CT scan, further foraminal encroachment related to small disc herniation

**James D. Weinstein, M.D., 1/2/02, Tr. 357**
Pre-operative diagnosis: cervical disc spondylosis

Post-operative diagnosis: cervical disc spondylosis

**Physical Residual Functional Capacity Assessment, 2/25/03, Tr. 359**
Exertional limitations
       Occasionally lift and/or carry 20 pounds
       Frequently lift and/or carry 10 pounds
       Stand and/or walk for a total of about 6 hours in an 8 hour work day
       Sit for a total o f about 6 hours in an 8 hour work day
       Push and/or pull: unlimited

Postural limitations
       Climbing, balancing, stooping, kneeling, crawling: occasionally

Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established

Environmental limitations
       Extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor
ventilation: unlimited
       Extreme cold, hazards: avoid concentrated exposure

**Christy D. Gallaher, M.A. and Michael D. Morrello, M.S., 8/18/03, Tr. 368**
WAIS-III
       Verbal IQ: 81 (index), 10 (percentile), 77-87 (confidence interval)
       Performance IQ: 91 (index), 27 (percentile), 85-98 (confidence interval)
       Full scale IQ: 85 (index), 16 (percentile), 81-89 (confidence interval)

WRAT-3
       Reading: 38 (raw score), 77 (standard score), 7 (grade score)
       Spelling: 34 (raw score), 78 (standard score), 6 (grade score)
       Arithmetic: 34 (raw score), 79 (standard score), 6 (grade score)

Diagnostic impression:
Axis I: depressive disorder, not otherwise specified
Axis II: deferred
Axis III: degenerative disc disease and herniated disc by medical record review
Axis IV: occupational problems related to social environment
Axis V: 55

**Psychiatric Review Technique, 8/28/03, Tr. 375**
The patient has depressive syndrome characterized by the following: anhedonia or pervasive loss
of interest in almost all activities, sleep disturbance, psychomotor agitation or retardation,
decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking

Functional limitation and degree of limitation
      Restriction of activities of daily living: mild
      Difficulties in maintaining social functioning: moderate
      Difficulties in maintaining concentration, persistence, or pace: moderate
      Repeated episodes of decompensation, each of extended duration: none

**Mental Residual Functional Capacity Assessment of Work-Related Abilities, 8/28/03, Tr. 389**

Limitations in understanding, remembering, and carrying out instructions
      Understand and remember short, simple instructions, carry out short, simple instructions: slight
      Understand and remember detailed instructions, carry out detailed instructions, exercise judgment or make simple work-related decisions: moderate

Limitations in sustaining attention, concentration, persistence, work pace, normal work schedules, normal work routines
      Sustaining attention and concentration for extended periods, maintaining regular attendance and punctuality, completing a normal work day and work week without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length of work breaks: moderate

Limitations in social functioning in a normal competitive work environment
      Maintaining acceptable standards of grooming and hygiene: slight
      Interacting appropriately with the public, responding appropriately to direction and criticism from supervisors, work in co-ordination with others without being unduly distracted by them, working in co-ordination with others without unduly distracting them, maintaining acceptable standards of courtesy and behavior, relating predictably in social situations in the workplace without exhibiting behavioral extremes, demonstrating reliability, ability to ask simple questions or request assistance from co-workers or supervisors: moderate

Adaptation in a work setting
      Ability to be aware of normal hazards and take appropriate precautions: moderate
      Ability to respond to changes in the work setting or work processes: marked

Functioning independently in a competitive work setting
      Carrying out an ordinary work routine without special supervision, setting realistic goals and making plans independently of others, traveling independently in unfamiliar places: moderate

Limitations in work adjustment
      Ability to tolerate ordinary work stress: marked

**James D. Weinstein, M.D., 9/18/03, Tr. 396**
Ord. diagnosis: bilateral arm pain

Impression: the study is abnormal and is supportive of bilateral carpal tunnel syndrome

**Residual Functional Capacity Assessment, 11/12/03, Tr. 400**
Which, if any of the following levels of work activity would the patient be capable of doing for an 8 hour day based upon their physical impairments alone?

The patient could do sedentary work, defined as sitting most of the time, walking and standing occasionally, lifting no more than 10 pounds

The patient must alternate positions frequently.

The patient requires a sit/stand option to change positions frequently.

The patient has the ability to sit and stand for 30 minutes at a time. He can walk for 20 minutes at a time. The patient can perform walking and standing for a combined total of 2 hours in an 8 hour work day.

The patient does not require the ability to recline with feet up during the work day.

The patient requires frequent periods of sitting during the work day.

The patient has limitations in the following areas as specified:
Climbing, balancing, stretching, reaching: never perform
Stooping, kneeling, crouching, crawling, squatting: infrequently perform

The patient's condition also causes the following limitations:
Excessive humidity, fumes, dust, environmental pollutants, excessive noise: avoid concentrated exposure
Cold or hot temperatures: avoid even moderate exposure
Machinery, jarring or vibrations, environmental hazards: avoid all exposure

The patient should be expected to experience chronic moderate pain.

The patient can use his feet and legs for repetitive movements such as pushing or pulling leg or feet controls.

The patient can use his hands for repetitive action in a job where repetition or prolonged use of hands is required. This includes both hands in simple grasping, arm controls, and fine manipulation.

The patient has loss of grip strength in both hands and numbness in both hands.

In the assessor's opinion, the patient is not capable of working 8 hours per day on a regular basis.

The patient has a mental impairment that in combination with other impairments results in a

greater degree of disability than either the physical or mental impairment alone would indicate.

D.   Testimonial Evidence

Testimony was taken at the November 13, 2003 hearing.  The following portions of the testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ALJ]

Q       Do you smoke?

A       Yes, sir.

Q       How much?

A       Estimated pack to a pack-and-a-half a day.

                              *                *                *

[EXAMINATION OF CLAIMANT BY HIS ATTORNEY]

Q       All right.  Start with the top of your head and work down and tell me what your symptoms are.

A       At times severe headache.

Q       Now when you feel the severe headache, where on your head does it hurt?

A       Right at the base of the spine behind the ears and behind the eyes.

Q       Now when you said behind your ears and behind your eyes, does it circle over the top of your head or just does it kind of go through from the back?

A       It kind of comes through.

Q       All right.  So it doesn't really get up to the top part, the crown of your head?

A       No.

Q       Okay.  It stops how far up the back, approximately?

A       Probably the back of my ears, the back of my eyes.

Q       Okay.  And approximately how often do you have what you describe as a severe headache?

A       Two or three times a week, severe headaches.

Q       All right.  So that sounds to be that's the most frequent that you have sometimes two or three.   How long can you go without having a severe headache, or in the past, approximately how much time have you had between severe headaches?

A       I might go as long as a week.

Q       Now in between severe headaches do you have any other head pain or are you headache free in between these severe headaches?

A       I'm not saying completely free.

Q       Tell me a little bit about that.

A       Just I call them mild headache.

Q       How often do you have a mild headache?

A       Usually constantly.

Q       So that's something that you just have pretty much all the time?

A       Pretty much.

Q       All right.  Now on a scale from zero to ten - - now zero is no pain and ten is bad enough that you need to go to the hospital and get a shot or go to the doctor's office and get a shot, that means unbearable pain, could you tell me - - use that scale to describe for me approximately what your pain level is when you have the severe headaches and the pain level when you call it a mild headache.

A       A mild headache, probably 2.

Q       Okay.  And where is the severe?

A       Usually 7 to an 8.

Q       Now approximately how long do the headaches last?

A       At times eight or ten hours.

Q       Okay.  So is that approximately the most?

A       Probably, yeah.

Q       All right.  What's the least, the shortest?

A       An hour, two hours maybe.

Q       And what can you do for the headaches?

A       I usually take medication and rest, lay down and shut my eyes.

Q       Is there anything that you have notices that tends to trigger the headaches, bring

them on, anything that you've been doing or weather or movements, anything like that?

A       No, ma'am, nothing I can point out.

Q       Okay.  Now you spoke about neck pain as well.

A       Yes, ma'am.

Q       And approximately how often do you feel neck pain?

A       Constantly.

Q       And using that scale that I gave you from zero to 10, could you tell me

approximately where your average pain level  is in your neck?

A       Depending on activity truthfully.

Q       Okay.

A    Average runs 3 to 4.

Q    Okay.

A    And top pain probably 8 to 9.

Q    All right.  Now you mentioned activity.  Could you tell me what sorts of things would tend to create an increase in your pain level?

A    Different activity, exercise.  The weather has a lot to do with it.

                    *              *              *

Q    Is there any area of your arms in which you feel the numbness and the tingling?

A    The whole arm clear into the hands.  I drop things.  Can't hold on to them.  I can't feel things when I pick it up.

Q    Are you limited in moving your neck or moving your shoulders?

A    Yes, ma'am.

Q    Let's talk about your neck first.  Are there any motions that you find more difficult than others, in other words, looking up, looking down, looking from side to side?  Are any of those more difficult than others?

A    I would say the worst is possibly looking up.

Q    Now are you able to look up but it hurts or can you not get your head up?

A    At times I can't get it up.  It hurts about all the time if I try to look up.

Q    What about looking down?

A    Not as bad as trying to look up.

Q    Does it have anything to do with how far down you try to put your chin to your chest?

A       Yes, ma'am.

Q       Do you have any difficulty with prolonged positions such as holding your head down such as maybe looking down at a desk or something like that or looking up?

A       I can't do it.  I just can't do it long at all.

Q       Which ones can't you do?

A       Neither.

Q       What about looking from side to side?

A       It's very limited.

Q       What is your most comfortable position for your head?

A       Usually straight ahead.

Q       Just kind of in a neutral position?

A       Yes, ma'am.

Q       Now I notice that you're bracing your head on your arm.  You're kind of leaning on it.  Is there any particular reason for doing that?

A       It hurts.  Neck pain.

Q       Does it help to kind of support your head in that way?

A       Yes, ma'am.

Q       What about movement of the arms at the shoulders, are you limited as far as the ability to reach in different directions?

A       Yes, ma'am.

Q       Can you do it but it hurts or are there some motions you just can't make?

A       There's some motions I just can't make.  I can lift light things at times.

Q       But now I'm thinking of maybe even empty handed, just more or less moving your arms around.

A       Just moving.

Q       All right.  Are there any directions - - well, let me ask you this: is any movement at the shoulder painful or does it depend on how much you have to stretch?

A       It depends on how far I have to stretch.

Q       All right.  Tell me what is the most - - well, just describe for me what limitations you have as far as the movement of your arms and shoulders.

A       Usually I can't lift any further than straight out in front of me.

Q       Okay.  What about out to the side?

A       At times I can't.  It hurts.

Q       Okay.  Do you have any difficulty doing things like getting dressed such as putting your shirt on or taking a coat on or off or anything?

A       Yes, ma'am.

Q       Do you need any help with those things or are you able to do those yourself?

A       I'm able to do them.

Q       All right.  Now looking at your hands or speaking about your hands, you've made several references to dropping things and feeling some numbness.  Let me ask you a few questions about that.  If you needed to be able, for instance - - well, are you able to eat with your hands?  You can hold a fork and a knife and coffee cup and eat?

A       Yes, ma'am, but I occasionally drop them too.

Q       What about doing things like grasping a pen or a pencil or a screw driver,

something like that? Are you able to do some of that?

A       Some of that, yes, ma'am.

Q       All right.   Just give me an estimate if you could of about how long you think you could grasp a pencil to write or a screw driver, for instance, to try to tighten a screw or something.

A       At times I can't do it more than a couple of minutes.

Q       All right.  So that would be the worse would be just a couple minutes at a time?

A       Yes.

Q       What's the best?  What would be the most you could do on a good day when you rested and so forth?

A       An hour, two hours possible.

Q       How often do you think your hands would be giving you enough difficulty that you would be limited to just a couple minutes?

A       50 percent of the time.

Q       Is it the sort of thing that the more you do it the worse it gets or is it the opposite, the more you do it the more they loosen up?

A       The more I do it the worse it gets.

                              *                *                *

Q       Okay.  All right.  Now working down to your back, you indicated that you had some aggravation of your low back with the same injury.  Could you tell me what, if any, problems you have with your lower spine or your hips or your legs, if any?

A       I still have severe pain in my lower back and legs, numbness in my legs, pain.

Q       Now the numbness that you speak of, where do you feel the numbness?

A       Mainly in my right leg, completely down the right side.

Q       You say the right side.  You mean like the outside?

A       Yes, the outside.

Q       Okay.  How far down does the numbness go?

A       Usually from about the mid knee.

Q       Do you feel any alteration of sensation in either of your feet?

A       Just numbness, tingling.

Q       Are you saying sometimes the numbness goes below the knee?

A       Yes.

Q       Does it have any bearing on any positions that you've been in or any activities that you've been doing as to when you feel the numbness?

A       I can't sit very long.  I can't walk very long.  I try to walk every day.

Q       Have your doctors advised you to do that?

A       To exercise, yes, ma'am.

Q       Was there a time when you - - or do you still carry out a regular walking program?

A       I try to, yes, ma'am.

Q       Approximately how far do you walk?

A       Sometimes a mile a day.  Sometimes up to three if possible if I'm able to.

Q       When you do that approximately how far can you walk without having to stop and rest and get off your feet?

A       Maybe a quarter of a mile tops at a time.  I have to sit down and rest.

Q       When you do the walking that you described are you doing this like all at the same time in a day?  You set out to take like a long walk and you rest along the way or are you taking it in different - -

A       In different intervals.

Q       Different intervals.

A       Usually all day.

Q       Do you have a special place that you do your walking that you can kind of measure how far you're - -

A       Around what's called the Hotel Bottom in Webster Springs and around the house.

Q       So you just sort of say so many trips equals so much.  Okay.  Now let me ask you about standing.  Approximately how long can you stand at one time before you need to get off your feet if you do?

A       Just standing as in one position in one area?

Q       Well, think about maybe standing at the kitchen sink or standing at a checkout line in a store or behind the counter or something like that.

A       Fifteen minutes probably, half an hour possibly.

Q       Okay.  When you do have to get off your feet, what do you feel is the reason that you have to get off your feet?

A       Back pain, numbness in the legs.

Q       Now as far as lifting you made reference to some lifting earlier.  Could you tell me approximately how much weight you could lift and carry on a regular basis without causing

yourself any undue pain or strain?  In other words, maybe not all day long but off and on during a day.  What do you think is about the most you could reasonably comfortably handle?

A       The doctors say no more than 20 pounds.

Q       Now approximately how often do you think you could lift 20 pounds during the day just - -

A       Different days, I'd have probably better days.  I mean I can't truthfully say I could do it for an hour at a time or half hour at a time.  I have no idea.  I haven't tried it for a while.

Q       When was the last time you lifted as much as 20 pounds if you remember?

A       I can't remember.

Q       Well, how much do you usually lift on a regular basis around the house?

A       Five, ten pounds.

Q       And is there anything you can think of that weighs about that much that you feel - -

A       Cat food, grocery bags, however much they weigh.

Q       Okay.  Now do you do any resting or lying down in the day time?

A       Usually at least once in the afternoon.

Q       What is the reason for that?

A       Pain.  I have to take medication.

Q       And in what form do you rest and approximately how long?

A       Usually for at least a couple hours. And sometimes I lay down on the floor, sometimes on the bed, sometimes on the couch depending on where I can get comfortable.

19

Q       Now are you talking about the one to two hours you were telling us about or is this at other times during the day, lying on the floor or on the bed or the couch?

A       At that time usually in the afternoon.

Q       Okay.  So if I understand you, you're more or less either sitting or standing or walking around say up until after about lunch time?

A       That's limited.  There's times I sit down before I have to go lay down.

Q       Okay.  When  you sit are you seated in a normal position with your back upright and your feet on the floor such as in a chair that you're in now?

A       Not always.

Q       Tell me what positions you sit in then.

A       Sometimes in a chair upright, sometimes in a recliner, sometimes even laid down on the floor.  I mean it's not - - I can't stand much of anything at any time for any period long.

Q       So you're shifting around and changing your positions fairly often?

A       Yes, ma'am.

Q       Now just so I understand what you're saying, the recliner that you're talking about, is this different from when you're lying down in the afternoon?

A       Yes, ma'am.

Q       Okay.  So this is at other times?

A       At other times before that.

                    *                    *                    *

Q       Now let me ask you about your sleeping.  Do you sleep all right at night?

A       An hour to an hour-and-a-half intervals.

Q        Do you just wake up off and on?

A        Yes, ma'am.

Q        How much sleep do you think you get if you put it all together, how much good sleep do you think you get in a normal night?

A        Two hours.

Q        In other words, very little?

A        Very little.

Q        Do you believe that's due to pain or other problems?

A        Pain.

Q        You've told us about your appetite.  The weight that you lost, did you start losing the weight right after the injury or do you think it was a while before that started coming down?

A        It started right after the injury.

Q        What about your mood?  Do you understand what I mean by your mood?  Do you have any difficulty with any kind of sadness or depression or anxiety or anything like that?

A        He had me on Zoloft I think for that.  Yes, I'm very moody.  I can see that.

Q        When you say you can see that, has anybody told you that?

A        I'm very short tempered.

Q        Is that something you've observed yourself or someone has pointed out to you?

A        My ex-wife over there if that means anything.

Q        Okay.  So do I understand that you're kind of irritable?

A        Very, at times.

Q        Has this irritability come out with any other people?  In other words, have you

had any experience with difficulties with other people out in the community or shopkeepers or people in a restaurant or anything like that?

A        I'm very short tempered since this.

Q        Is this something new or were you always that way?

A        Something new.

Q        Any difficulty as far as being interested in things, in other words, having enthusiasm about life and looking forward to the future or anything like that?

A        None.

Q        What do you mean none?

A        No enthusiasm.  I could care less.

*        *        *

Q        Well, do you feel that you're unable to take care of yourself now?

A        Yes, ma'am.

Q        In what way does your ex-wife help you?

A        She still does the cooking, the laundry, takes care of all the running, takes me places.  I can't hardly drive for long periods of time.

Q        When you say running, describe to me what you mean.

A        Daily routine, things that has to be done.

Q        Do you drive at all?

A        Some.  Short periods.

Q        What's about the length of time that you can drive?

A        Half hour tops probably.

Q       What is difficult about the driving?

A       Numbness in my arms, pain.

Q       And where do you feel the pain?

A       In my shoulders and neck.

Q       Do you have any particular difficulty as far as finishing things, beginning tasks, finishing them, keeping your mind on what you're doing?

A       I'm very inpatient with anything anymore as far as getting enthusiasm to start a project or even finish it if I do start it.

Q       Are there any outdoor chores that you're able to do and that you have done through this period?

A       With time I can still do a little bit of it such as mowing the grass.  It takes me longer.

Q       What kind of machine do you use to mow the grass?

A       I have a trim mower and a riding mower.

Q       How much time do you spend on that and over what period of time?

A       What used to take me two hours to do now takes me two days.

Q       Just stop and start?

A       Yes, for short periods of time.

Q       Any clubs or hobbies, anything that you get out and do?

A       No, ma'am.

Q       How about getting out and visiting with people?

A       I don't anymore.

Q       Any particular reason?

A       I don't feel like it personally.

*                *                *

[EXAMINATION OF CLAIMANT BY ALJ]

Q       You used to like to hunt and fish?

A       Yes, sir.

Q       Do you do that anymore?

A       No, sir.

Q       Do you have a license?

A       I have a life time license, yes.

*                *                *

Q       Since your March, '01 injury, you told me you have a life time hunting license or fishing but have you done any of either since March, '01?

A       Probably three or four hours tops.

Q       Of which one?

A       Fishing and hunting.

Q       Okay.  So some time before your surgery or after your surgery.  Can you pin point it or do you know?

A       I can't pinpoint it.

Q       How about last fall?  That was the fall of '02.

A       Possibly an hour or two last fall.

Q       Okay.  Thank you, sir.  You don't have a cane, do you?

A       No, sir.

Q       Just run down briefly yesterday.  What did you do yesterday?

A       I got out of bed approximately 9:00, 9:30.  Left around the house till 12:30, 1:00, not much activity.  Took a shower, cleaned the inside of my vehicle.  Laid down and rested for about an hour to a hour-and-a-half approximately 2:30, 3:00.  Got up off the couch and got something to eat, took medication, took a shower, and went to church about 5:30.

\*          \*          \*

Q       Do you read during the day?

A       At times.

Q       What do you like to read?

A       Sports magazines, newspaper.

Q       Any books?

A       Very seldom.

Q       Do you watch television?

A       Occasionally.  Not a whole lot.  It usually boils down to the news at noon and the news of the evening.

\*          \*          \*

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]

Q       Would you describe Mr. Gregory's past work, please?

A       Okay.  The work as the coal mine equipment operator is classified as medium exertional with a specific vocational preparation of 4.  Now the file indicates he was lifting 100 pounds at a time so he was actually performing it at the heavy exertional but customarily it's

recognized as medium.  Truck driver is recognized customarily as medium exertional, SVP 4,

semiskilled.  Now the Claimant testified at times he was lifting over 100 pounds.  Therefore, he

was performing at the very heavy exertional.  Caretaker recognized as a medium exertional, SVP

2, so it is unskilled work.  The EMT is recognized as a medium exertional customarily, SVP 5,

so it is considered skilled.  He indicated he was performing it at a heavy exertional.  The

ambulance driver is customarily recognized as very heavy exertional, SVP 4, semiskilled.  And

coal company laborer is recognized as a heavy exertional, unskilled, SVP 2.

Q       Please assume a younger individual with a GED - - I mean a high school

education precluded from performing all but sedentary work with the sit/stand option, no

repetitive bending, only occasional posturals, no hazards such as machinery and heights, no

temperature extremes, a controlled environment, and work that is unskilled and low stress,

defined as one and two-step processes, routine and repetitive tasks, primarily working with

things rather than people, entry level.  With those limitations can you describe any work this

hypothetical individual can perform?

A       Okay.  Falling within the hypotheticals given plastic design applier, 60,000

national, 300 regional, laminator  I, 75,000, national 1, 400 regional, type copy examiner, 70,000

national, and regional 1 we're looking at 300.  And that's a sampling, sir.

Q       Are those jobs consistent with the DOT?

A       In general they are.  The difference would be since the DOT was last published in

1991 the jobs to maintain the statistics includes other industries that the DOT didn't recognize at

the time it was originally published.  And the DOT also gives you the maximum requirements

for the jobs, and they name several different jobs under several different DOT titles but in

general it would be consistent.

Q    Sir, if I added to hypothetical one, Dr. Osborne indicates the Claimant has loss of grip strength and numbness in both hands, yet she says he can use his hands for simple grasping, arm controls, and fine manipulation, but in looking at the medical evidence in the light most favorable to Mr. Gregory if he has restrictions with repetitive fine manipulation and would require a combination to primarily gross grasping strength are those jobs affected, and, if so, can you name additional jobs?

A    No, there's no fine manipulation involved with the positions I used in the sampling, sir.

Q    Dr. Osborne in question hypothetical three says the Claimant is incapable of performing a full-time job, number one, and also states - - what I wanted to focus on was that she says he needs rest periods.  It doesn't say how many.  Assuming the Claimant's testimony is credible that he has to have a 1-1/2 hour approximate laying down period in mid-afternoon each day, are those jobs accommodatable?

A    No, they would not be.

Q    As you may have heard at the hearing, the Claimant was examined at the request of counsel, and by a mental health specialist, a psychologist, who stated the Claimant has a number of moderate limitations and marked limitations.  The most significant would appear to be in Exhibit 20F, page 3, marked inability to respond to work setting or work processes.  Marked is defined in this form as 1/3 to 2/3 of the day.  If the Claimant cannot respond to changes in the work setting or work processes for 1/3 to 2/3 of the work day are any jobs precluded?

A    These are repetitive positions, sir.  Now when they talk about it, it's really

whether or not an individual can maintain stability in any work setting for any given period of time is basically what I interpret that to mean, and that being the case I would say the person would not be able to perform any type of job but if it was just simply changes in the work place that wouldn't have an effect on the three positions I have mentioned.

Q        If the Claimant cannot - - if I interpret the MRFC of that specialist and Dr. Osborne's statements regarding concentration to mean that the Claimant cannot stay on task ½ to 2/3 of the day, are those jobs impacted?

A        Yes, they are, sir.

Q        To the point they can't be performed, right?

A        Yes.

ALJ        Okay.  Ms. Van Nostrand.

ATTY        Judge, just a comment that I believe the definition is ½ to 2/3 at the marked level.

ALJ        Okay.  I'm sorry.

ATTY        That's all right.

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q        But that's all right.  I assume, and I'll just ask Mr. Czuczman that wouldn't make any difference in what you said?

A        That would still prevent him from being able to do the jobs.

Q        Still prevent him.  Right.

A        Yes.

Q        Okay.  One of the other marked limitations was in the ability to tolerate ordinary

work stress, and that might have been more responsive to what you were talking about in maintaining stability in the work setting. That one is also at the marked level. Would that one also tend to preclude regular employment?

A      That's very subjective because everyone has a different stressor.

Q      Right.

A      Some people can't work with people around them. It's stressful. Some people can't work if they're alone. Some people can't work in darkness. But if we're just talking about the idea of a job in itself, regardless of whether it is being stressful for an individual to maintain that schedule, then, yes, it would prevent his ability to perform work.

Q      I believe the form that Dr. Osborne filled out defines frequent as up to 2/3 of the work day and what that would mean as far as frequent rest breaks is that 2/3 of the time the person would need extra breaks, you know, more than normally provided, and we can glean from what the file says and from what the testimony says that this is not always at a regular schedule even thought the afternoons he may need more breaks. Apparently he does some breaks during the rest of the day. So if that is the interpretation on needing frequent rest breaks does your answer remain the same?

A      That would prevent his ability of doing full-time work, yes, ma'am.

Q      Now one other thing. When we're going back and we're looking at the jobs that you identified on the basis of the Judge's hypothetical question - -

A      Yes.

Q      I'd like for you to assume that in addition to those limitations that he gave you that he is never to in a job situation as part of the job be required to stretch or reach. Now the

reason for this is the problems he has with the cervical spine and holding the arms out such as reaching or stretching which is a little bit more of a strained reach in my opinion that both of those movements are precluded as far as work setting, that he should be an a situation where he could have his elbows more or less closer to his torso so that he didn't have to have much arm movement.  Now I'm wondering if any of those positions would be affected by that additional - -

A    If a person can never reach or stretch he's not going to be able to perform the jobs.

Q    Okay.  Now we understand that the gentleman can at home reach in the refrigerator.  he can put his clothes on.  He can read a magazine.  But as I understand what Dr. Osborne is saying here that this shouldn't be a part of a job where he has to move his arms around.

A    Of all the jobs recognized in the DOT only 1 percent of them, which is 110 recognized jobs with all different exertionals, recognize that no reaching would be required so it's very limited.

ALJ    Okay.  In other words, almost no jobs.  Okay.

*        *        *

E.    <u>Lifestyle Evidence</u>

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

•    Has the ability to care for his personal needs and grooming (Tr. 139)

•    Does lawn care, washes a car, and takes out the trash (Tr. 140)

- Watches television for one to two hours per day (Tr. 141)

- Goes hunting with assistance from an ATV in the woods (Tr. 141)

-  Smokes cigarettes (Tr. 310)

- Can lift twenty pounds infrequently and five to ten pounds on a regular basis (Tr. 438)

- Has the ability to drive for half an hour (Tr. 443)

- Mows the grass on a riding lawn mower (Tr. 444)

### III.  The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence. Claimant makes ten arguments of error in this regard.  Claimant argues that the ALJ erred (1) by failing to identify his severe impairments of chronic low back strain and adhesive capsulitis, (2) by continuing in the disability determination without identifying all severe impairments (3) by failing to consider the combined effects of Claimant's impairments by the failure to identify all severe impairments, (4) by failing to consider whether Claimant qualified for disability under listing 1.02B, (5) by failing to consider Claimant's impairments under listing 1.04A, (6) by failing to call a medical expert to determine whether Claimant's conditions equaled a listing, (7) by mis-stating the evidence concerning listing 12.04C, (8) by incorrectly applying Fourth Circuit precedent regarding Claimant's complaints of pain, (9) by asking the Vocational Expert an incomplete hypothetical question, and (10) by including a sit-stand option in the residual functional capacity without specifying how often Claimant would need to alternate sitting and standing.

Commissioner maintains that the ALJ's decision was supported by substantial evidence.

Commissioner contends the ALJ properly determined Claimant's alleged chronic low back strain and adhesive capsulitis do not present severe impairments. This means arguments one, two, and three of Claimant fail. Commissioner also contends Claimant's arguments regarding listings 1.02 and 1.04 are without merit. Commissioner likewise maintains the ALJ committed no error in declining to take testimony from a medical expert and in considering listing 12.04C. Commissioner argues the ALJ properly applied Fourth Circuit precedent regarding pain and that the ALJ's hypothetical question to the Vocational Expert adequately displayed Claimant's limitations. Finally, Commissioner argues the ALJ did not err by including a sit-stand option in the residual functional capacity.

B.      The Standards.

1.      Summary Judgment. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.      Judicial Review. Only a final determination of the Commissioner may receive

judicial review.  See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.      Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that he has a medically determinable impairment that is so severe that it prevents him from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.      Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.      Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that he was disabled before the expiration of his insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.      Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.      Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently

explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8. Social Security - Substantial Evidence - Defined. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9. Social Security - Sequential Analysis. To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether he has a severe impairment, 3) whether his impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform his past work; and 5) whether Claimant is capable of performing any work in the national economy. Once Claimant satisfies Steps One and Two, he will automatically be found disabled if he suffers from a listed impairment. If Claimant does not have listed impairments but cannot perform his past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.      Discussion

I.

The ALJ's Decision Not to List Chronic Low Back Strain and Adhesive Capsulitis of the Shoulders as Severe Impairments

Claimant first argues the ALJ erred in failing to find his impairments of chronic low back strain and adhesive capsulitis of the shoulders as severe impairments. Claimant contends the evidence shows these conditions were severe. Commissioner argues that substantial evidence supports the ALJ's conclusion that these impairments are not severe.

The Regulations state that "An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). Basic work activities are "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). The Regulations provide a number of examples. Id.

The ALJ determined Claimant had some severe impairments. The ALJ found Claimant suffered from the severe impairments of "status post cervical discectomy with a history of surgery . . . chronic cervical strain and sprain syndrome, bilateral carpal tunnel syndrome, and depressive disorder, not otherwise specified." (Tr. 22). The ALJ's findings will be upheld as long as they have substantial evidence to support them. Hays, 907 F.2d at 1456.

The Court concludes substantial evidence supports the ALJ's decision not to include chronic low back strain and adhesive capsulitis of the shoulders as severe impairments. The record contains significant evidence demonstrating Claimant suffered from low back impairments in the 1980s. (Tr. 176, 178, 182, 350). However, the recent records document the impairment of cervical strain, not back strain. (Tr. 241-46, 282, 289, 291, 293-98). In fact, Dr. Weinstein stated in 2001 that he treated Claimant in the 1980s for his back impairments, but

35

those problems "got better eventually" and Claimant returned to work. (Tr. 342). Dr. Sabio's report seems to stand alone for a recent diagnosis of back impairments. (Tr. 312). Dr. Sabio's report is also alone in diagnosing adhesive capsulitis. (Id.). The Court believes the record provides substantial evidence to support the ALJ.

Claimant's second and third assignments of error depend on success from the first argument and therefore must fail. Claimant's second argument was that because the ALJ failed to consider all the severe impairments, his sequential analysis was therefore invalid. Claimant's third argument was that the ALJ failed to consider the combined effects of his impairments by omitting the allegedly severe impairments in the first argument. Since the Court finds substantial evidence supports the ALJ's decision to omit these impairments, these arguments likewise fail.

## II.

### Whether the ALJ Should Have Considered Listing 1.02B and 1.04A

Claimant next contends the ALJ erred by failing to consider whether he qualifies for disability under listing 1.02B and 1.04A. Claimant concedes he cannot meet the requirements of listing 1.02B, but argues he may be able to equal it. Claimant also contends he may be able to equal listing 1.04A. Commissioner contends substantial evidence supports the ALJ's decision.

The ALJ did not consider listing 1.02B at all in his opinion. (Tr. 22). The ALJ did consider listing 1.04, but only is a very summary way. (Id.). The ALJ's decision will be upheld as long as it is supported by substantial evidence. Hays, 907 F.2d at 1456.

Medical listings are considered at the third step of the disability determination process. 20 C.F.R. § 416.920(a)(4)(iii). If the ALJ determines a claimant suffers from a severe

impairment, he must consider whether the claimant meets a medical listing. Stemple v. Astrue, 475 F. Supp. 2d 527, 541 n. 34 (D. Md. 2007).

If Claimant meets a listing, he is considered disabled and entitled to benefits. 20 C.F.R. § 416.920(a)(4)(iii). In Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986), the Fourth Circuit held the ALJ has a duty to identify the relevant medical listings and compare the evidence with the requirements of the listings. However, in McCartney v. Apfel, 28 Fed. Appx. 277, 279 (4th Cir. 2002), the court held a discussion of the evidence at step four of the disability process may substitute for a discussion at step three. The McCartney court was careful to point out that the evidence in the record made clear the ALJ had considered the listing. Id. Since the ALJ had viewed the claimant's "conditions through the prism" of the listing, the court rejected the argument the ALJ's decision was procedurally faulty. Id. at 280. The District of Maryland well summarized the significance of this law for when it is alleged, as here, that the ALJ failed to consider a relevant medical listing, in Schoofield v. Barnhart, 220 F. Supp. 2d 512, 522 (D. Md. 2002). The court stated:

> When the evidence in the administrative record clearly generates an issue as to a particular listing in the LOI [Listing of Impairments] and the ALJ fails to properly identify the LOI considered at Step Three, and to explain clearly the medical evidence of record supporting the conclusion reached at that critical stage of the analysis, a remand can be expected to result, except in those circumstances where it is clear from the record which listing or listings in the LOI were considered, and there is elsewhere in the ALJ's opinion an equivalent discussion of the medical evidence relevant to the Step Three analysis which allows this Court readily to determine whether there was substantial evidence to support the ALJ's Step Three conclusion.

Id.

Therefore, under Schoofield, the court must ask a series of questions. First, does the record generate an issue as to a listing? Schoofield, 220 F. Supp. 2d at 522. If not, the inquiry

obviously ends there.  <u>Cook</u>, 783 F.2d at 1173 (providing that only relevant listings need to be

identified).  If there is an issue, does the record make clear the listing was considered?

<u>Schoofield</u>, 220 F. Supp. 2d at 522.  If the record does not show this, the Court must remand for

consideration.  <u>Id.</u>  If the listing was considered, did the ALJ discuss the evidence at another

point in his opinion to allow the Court to find substantial evidence supports the step three

analysis?  <u>Id.</u>

>   Listing 1.02B provides for a finding of disability as follows:
>
>   **1.02  *Major dysfunction of a joint(s) (due to any cause)***: Characterized by gross
>   anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis,
>   instability) and chronic joint pain and stiffness with signs of limitation of motion
>   or other abnormal motion of the affected joint(s), and findings on appropriate
>   medically acceptable imaging of joint space narrowing, bony destruction, or
>   ankylosis of the affected joint(s).  With:
>
>   . . .
>
>   B.  Involvement of one major peripheral joint in each upper extremity (i.e.,
>   shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross
>   movements effectively, as defined in 1.00B2c.

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.02B.  Listing 1.00B2c defines an inability to perform fine

and gross movements as follows:

>   Inability to perform fine and gross movements effectively means an extreme loss
>   of function of both upper extremities; i.e., an impairment(s) that interferes very
>   seriously with the individual's ability to independently initiate, sustain, or
>   complete activities.  To use their upper extremities effectively, individuals must
>   be capable of sustaining such functions as reaching, pushing, pulling, grasping,
>   and fingering to be able to carry out activities of daily living.  Therefore,
>   examples of inability to perform fine and gross movements effectively include,
>   but are not limited to, the inability to prepare a simple meal and feed oneself, the
>   inability to take care of personal hygiene, the inability to sort and handle papers
>   or files, and the inability to place files in a file cabinet at or above waist level.

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.00B2c.

The Court concludes substantial evidence supports the ALJ's decision not to consider this listing since the record does not present an issue regarding it. First, Claimant bases much of his argument on the adhesive capsulitis found by Dr. Sabio. Pl.'s Br. at 11. As noted above, substantial evidence supports the ALJ's decision to not find this a severe impairment. Second, Claimant's impairments do not prevent him from carrying out the basic activities of daily living required by the listing. Claimant reported he has the ability to fully care for his personal hygiene. (Tr. 139). He is capable of performing lawn care, washing a car, and taking out the trash. (Tr. 140). Claimant is capable of eating with his hands, though he occasionally drops things. (Tr. 433). He has the ability to use both hands for simple grasping, arm controls, and fine manipulation (Tr. 405). Thus, there is no issue of this listing under the record and the ALJ was not required to consider it.

Listing 1.04A provides for a finding of disability as follows:

**1.04 *Disorders of the spine*** (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. pt. 404, subpt. P, app. 1, § 1.04A.

The Court has already determined any chronic back strain or adhesive capsulitis Claimant may suffer from do not present severe impairments. Therefore, these impairments need not be considered at step three of the disability process. Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000). This means Claimant must rely upon his cervical impairments and carpal tunnel

syndrome to give an issue under the listing.

The evidence establishes Claimant has degenerative disc disease resulting in compression of the spinal cord. (Tr. 281, 297, 373). His impairments have caused a "marked decreased decreased range of motion with forward flexion, extension and lateral side bending." (Tr. 301). Claimant experiences pain in his neck and paresthesias of his arms. (Tr. 396). Claimant also has bilateral carpal tunnel syndrome. (Tr. 398-99).

The Court believes this evidence is sufficient to at least raise an issue of the applicability of listing 1.04A. The ALJ's one sentence consideration of this listing is clearly insufficient. (Tr. 22). The ALJ's statement regarding this listing represents no analysis at all, but rather "a bare conclusion." Clifton v. Chater, 79 F.3d 1007, 1009 (10th Cir. 1996). Since the ALJ's opinion makes clear he was aware of the potential applicability listing 1.04, the Court must determine whether the ALJ discussed the relevant evidence at another point in his opinion so as to allow the Court to conclude substantial evidence exists. Schoofield, 220 F. Supp. 2d at 522.

The Court concludes substantial evidence exists from the ALJ's discussion of the evidence at step four of his opinion to support the ALJ's decision that Claimant does not meet the requirements of listing 1.04A. The ALJ comprehensively evaluated the relevant evidence when determining Claimant's residual functional capacity. (Tr. 24-26). For instance, the ALJ noted Claimant complained of neck pain and decreased ability for movement in September 2001. (Tr. 24, 301). The ALJ then noted Claimant had surgery to correct a herniated disc in 2002. (Tr. 24, 305). Although Claimant continued to experience problems in his neck, they were related to a sprain or strain and so were not correctable with surgery. (Tr. 24, 330). The ALJ further related that when Claimant underwent a consultative examination in 2002, he exhibited some

limitation in motion, but also had the ability to "walk on his heels, toes, walking heal-to-toe, and tandem, as well as standing on either leg separately, and squat fully, with normal fine fingering movements." (Tr. 25, 313). While Claimant stated he needed to lie down for a couple hours per day due to pain, Dr. Osborne did not find this limitation. (Tr. 26, 403). In sum, the Court believes the ALJ's thorough analysis of the evidence at step four of the disability process clearly shows that if the ALJ had more fully explained his reasoning regarding listing 1.04A, he would have rejected the claim of disability. Substantial evidence therefore supports the ALJ's decision in this regard.

Claimant also contends the ALJ abused his discretion in failing to call a medical expert since Social Security Ruling 96-6p requires that before a finding can be made that a medical listing is equaled, the ALJ must obtain testimony from a medical expert. The Court has already rejected Claimant's arguments regarding equaling a listing. Therefore, this argument also fails.

III.

Whether the ALJ Ignored Relevant Evidence Regarding Listing 12.04C

Claimant contends the ALJ ignored relevant evidence regarding listing 12.04C. Claimant states that while the ALJ stated that the evidence did not show Claimant would decompensate with a minimal increase in mental demands, one psychologist did make this finding. Yet the ALJ gave no consideration to this report. Commissioner contends substantial evidence supports the ALJ's decision and therefore urges the Court to affirm.

The ALJ may not "pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence." Hardman v. Barnhart, 362 F.3d 676, 681 (10th Cir. 2004). On the other hand, the Seventh Circuit has held that a written evaluation

of every piece of evidence is not required, so long as the ALJ articulates at some minimum level his analysis of a particular line of evidence. Green v. Shalala, 51 F.3d 96, 101 (7th Cir. 1995). Also, the Eighth Circuit has held that the ALJ's mere failure to cite specific evidence does not establish that he failed to consider it. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).

The ALJ considered whether Claimant qualified for disability under listing 12.04. (Tr. 22-24). When the ALJ evaluated the C criteria of the listing, he found that the evidence did "not support a finding that the claimant would decompensate with even a minimal increase in mental demands or change in the environment." (Tr. 23).

In a psychiatric review technique form from August 2003, psychologists Christy Gallaher and Michael Morrello reached the opposite conclusion regarding Claimant's ability to cope with changes in the environment. (Tr. 386). They determined that Claimant had a mental impairment that would cause him to decompensate in response to even a minimal additional to mental requirements. (Id.). The ALJ did not expressly consider this report in his evaluation.

The Court concludes that the ALJ's analysis of the remainder of listing 12.04 provides substantial evidence to support the ALJ's decision. First, the ALJ determined that "The objective medical evidence . . . shows that the claimant's limitations on daily activities are no more than 'mild.'" (Tr. 23). In support of this finding, the ALJ noted that Claimant walks up to several miles per day, performs household repairs, washes cars, and takes out the trash. (Id.). Claimant can mow and trim the grass. (Id.). Concerning social functioning, the ALJ noted Claimant receives visits from his brother and is able to keep doctor's appointments. (Id.). Finally, concerning concentration, persistence, and pace, the ALJ stated Claimant was able to answer all questions at the hearing clearly. (Id.). This analysis clearly provides substantial

evidence for the ALJ's determination that Claimant would not experience decompensation upon a minimal increase in mental demands or change in the environment. The ALJ more than adequately explained his reasoning, even if he did not examine the particular report Claimant mentions. <u>Green</u>, 51 F.3d at 101.

IV.

<u>The ALJ's Analysis of Claimant's Alleged Pain</u>

Claimant contends the ALJ erred in his analysis of Claimant's subjective complaints of pain. Claimant's argument is one of legal technicalities. Claimant argues that under Fourth Circuit precedent, the ALJ must specifically identify which medically determinable impairments could reasonably be expected to cause which subjective complaints. Claimant contends the ALJ must include both, but in this case simply made a general statement that Claimant has impairments that could be reasonably be expected to cause pain. Commissioner argues the ALJ followed the correct legal standard. Since the issue here is whether the ALJ followed the law, the Court conducts de novo review. <u>Milburn Colliery Co.</u>, 138 F.3d at 528.

The Fourth Circuit discussed the evidence a claimant must show of allegedly disabling pain in <u>Craig</u>, 76 F.3d at 594. The court held that for a claimant to be found disabled based on pain, "there *must* be shown a medically determinable impairment which could reasonably be expected to cause not just pain . . . but *the pain the claimant alleges she suffers*." <u>Id.</u> (emphasis in original). The claimant must show an impairment that could produce "the actual pain, in the amount and degree, alleged by the claimant." <u>Id.</u> In <u>Craig</u>, the court found error on the part of the ALJ because he "did not expressly consider the threshold question of whether Craig had demonstrated by objective medical evidence an impairment capable of causing the degree and

type of pain she alleges." Id. at 596.  The ALJ erred by directly "considering the credibility of her subjective allegations of pain."  Id.

In this case, the ALJ found Claimant had medically determinable impairments that could cause pain.  (Tr. 26).  He did not, however, make a threshold finding of whether Claimant's impairments could reasonably be expected to cause the amount of pain Claimant alleges.  This was error under Craig.  Therefore, the case must be remanded to the ALJ so he may expressly consider whether Claimant's impairments could cause the pain alleged.

V.

The Adequacy of the ALJ's Hypothetical Question

Claimant contends the hypothetical question the ALJ propounded to the Vocational Expert at the administrative hearing was incomplete.  Claimant points out that when the Vocational Expert was asked if a person with Claimant's other limitations could also not perform any reaching as part of a job, the Vocational Expert responded such a person would have no positions available to them.  Claimant therefore argues a proper hypothetical questions should have included a prohibition from reaching.  Commissioner argues the ALJ asked a proper hypothetical question.  Commissioner states the record does not support a prohibition from all reaching.

The Fourth Circuit has held that a proper hypothetical question must "fairly set out all of claimant's impairments."  Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989).  It was later held that only severe impairments must be included in a hypothetical, while other minor impairments may be omitted.  Russell v. Barnhart, 58 Fed. Appx. 25, 30 (4th Cir. 2003).  None of the ALJ's hypothetical questions included a prohibition from reaching.  (Tr. 452-55).  The residual

44

functional capacity the ALJ ultimately assigned to Claimant also did not include this limitation. The question is whether the record supports the ALJ's rejection of this limitation. The ALJ will be upheld as long as there is substantial evidence. Hays, 907 F.2d at 1456.

Although the Court believes substantial evidence supports the ALJ's decision not to credit Claimant's alleged limitation of a complete inability to reach, the Court concludes substantial evidence does not support his decision to include no limitation regarding reaching. Dr. Sabio found that Claimant had ninety degrees of abduction in his shoulders and one hundred degrees of forward flexion. (Tr. 312). His elbows allowed 150 degrees of forward flexion, zero degrees of bilateral extension, and eighty degrees of bilateral supination and pronation. (Id.). Regarding his wrists, Claimant had sixty degrees of bilateral dorsiflexion, seventy degrees of palmar flexion, radial deviation of twenty degrees, and ulnar deviation of thirty degrees. (Id.). A physical residual functional capacity assessment from December 2002 found also found Claimant had limitations in reaching. (Tr. 318). Dr. Osborne stated Claimant should perform no reaching. (Tr. 403). On the other hand, a physical residual functional capacity assessment from February 2003 determined Claimant had no limitations in reaching. (Tr. 362). While these documents do not support Claimant's extreme alleged limitation of an inability to perform reaching, they also give substantial support to the notion Claimant has some limitations in reaching. The Court has found nothing in the ALJ's opinion to explain why Claimant was not assigned any reaching limitations. Therefore, on remand, the ALJ should evaluate the evidence regarding Claimant's alleged limitations in reaching.

# VI.

## Whether the ALJ Erred in Assigning Claimant a Sit-Stand Option Without Specifying the Frequency He Would Need to Alternate Sitting and Standing

Finally, Claimant argues the ALJ erred in including a sit-stand option in the residual functional capacity assessment without specifying the frequency Claimant would need to alternate sitting and standing. Claimant contends this violates Social Security Ruling (SSR) 96-9p. Commissioner argues the ALJ did not violate SSR 96-9p since the ALJ's opinion provided for the option to sit or stand at will.

SSR 96-9p addresses situations where a claimant needs the option of alternating between sitting and standing at work. It provides that in such situations, the ALJ's residual functional capacity assessment "must be specific as to the frequency of the individual's need to alternate sitting and standing." SSR 96-9p.

However, case law within the Fourth Circuit clearly indicates the term "sit/stand option," by itself, provides for the ability to "sit or stand at will during the workday." In Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002), the ALJ asked the Vocational Expert a hypothetical question including a "sit/stand option." The Fourth Circuit found another way of saying this as that the claimant needed "to sit or stand at his option." Id. at 289. In Zarkowski v. Barnhart, 417 F. Supp. 2d 758, 762 (D.S.C. 2006), the Vocational Expert testified that a "sit/stand option" meant the claimant could "either sit or stand as was necessary." The court in Perkins v. Apfel, 101 F. Supp. 2d 365, 377-78 (D. Md. 2000) also described a "sit/stand option" as "the option to sit or stand as needed."

In this case, the ALJ's residual functional capacity assessment included a sit-stand option, but did not specify how often Claimant would need to alternate sitting or standing. (Tr.

27). Under the case law cited above, the sit-stand option was sufficiently clear to indicate Claimant must have the ability to sit or stand at will. The ALJ should be affirmed in this regard

## IV. Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be GRANTED and the case REMANDED to the Commissioner because the ALJ failed to properly analyze Claimant's subjective complaints of pain and because substantial evidence does not support the ALJ's failure to include any limitations in reaching in his hypothetical question to the Vocational Expert.

2.      Commissioner's Motion for Summary Judgment be DENIED for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: August 6, 2007

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE